The argument is Novak v. Board of Trustees. Mr. Duren. Good morning, Your Honors. My name is Daryl Dunham. I'm here representing the plaintiff, Patrick Novak. There's three issues I'm going to raise for review. I'm not going to, unless the court has questions on the motion to exclude. I think that's covered in the briefs. And I've been here before, and time flies, and I do want to just say a few brief words about the motion to strike. The SIU filed a motion to strike our disclosure of experts. What are you talking about? Would you get to the point, please? I'll try, Your Honor. I filed a motion to strike their reply to a pleading in the district court. What's the motion to strike about? Talk about the merits of the case. Your Honor, it was denied as moot, but I believe that it's something that should be considered by the court because, as I understand the precedent and the informal precedent in the district court, we cannot file a Rule 11 motion unless the pleading that's been filed by the defendants has been denied as lacking in merit. So that's why I think it's something that I would like the court to review. And in their motion to ask for Lee to file a reply, they made several representations about what they were going to present to the court. They said that my pleading, my response, inaccurately stated the procedural history of the case, and it inaccurately stated key facts, had made arguments that had no basis in fact or reason, that I had cited cases that were distinguishable or inapplicable, and mischaracterized their motion. They filed their pleading, and I actually filed a response and said, look, I'm not going to object to this because if I really did... Well, are you going to discuss the merits of the case or just this procedural haggling? I am going to. All I can say is, Your Honor, they did not follow their representation. Counsel, I'd suggest that you follow Judge Posner's recommendation and get to the merits. I will. Thank you, Your Honor. The key basis of the appeal is whether or not we can survive, we have enough evidence in the record to survive a motion for summary judgment. We concede, and we conceded repeatedly in the briefs, that in matters of academic judgment, there is great deference given by this court, the Supreme Court, and that is a standard that's out there, and we understand that, and we understood that when we filed the case. We do believe, however, that there's no case, either in this court or in the United States Supreme Court, that takes the position that the decision of academicians is unreviewable, and I think that there is sufficient... But what is the evidence of discrimination? Your Honor, we have no direct, actual direct evidence where anybody, any of the three individual defendants have said, I am voting this way or I'm acting this way because I don't like do have evidence, I think, that in terms of pretext and indirect evidence that goes to show that they applied a different standard, a vastly different standard, Mr. Novak, that permits a trier of fact to conclude that the basis for their decision was their concern about his post-traumatic stress syndrome. What is your evidence of pretext? What is my... What is your evidence of pretext? Okay, well, with regard to Defendant Smith, she filed an affidavit in this case, but as I indicate in the brief, what she testifies in her deposition has to control over what she says in her affidavit, and it's a very long exchange between myself and Defendant Smith, and if you look in the brief there, Mr. Novak was given an assignment for day three, and basically she agreed in one form or another that Mr. Novak had complied with the assignment, except for the needs, the literature review gap in the literature, which he was conceitedly had to set out what the gaps were in the literature. And so I pondered her on that and I asked her questions and went through his submission to the committee and asked, well, doesn't this show a gap in the literature and the like? When ultimately she said, well, nowhere in his submission does he have a heading that says gaps in the literature. She said, no, that's not a requirement necessarily, but at least there should have been some kind  You're just saying you disagree with, you think they didn't grade his submission accurately. Where is the implication that discrimination has anything to do with this? Your Honor, if this were just simply a case where we had an academic disagreement with what Dr. Smith and the other two individual defendants did when we should have never filed the case, I would agree with that. But then I took Ph.D. thesis, which had been published, was in Morris Library down at SIU, and I showed her three of them and I said, now you sat on these committees, you were the chair of one of these committees, we're in these submissions. Now these are Ph.D. theses. This is not just a prelim. These are actually published theses where Dr. Smith voted to award these people a Ph.D. I said, we're in any of these. Well, how do you compare a thesis with a submission? Because, Your Honor. This thesis is going to contain a lot more material, which may persuade the examiners that it's a substantial piece of work. Because she testified that the same requirement that she was imposing on Mr. Novak was the same requirement that she would require in the ultimate product that was published in the SIU library. But there's more stuff in the Ph.D. thesis, right? Even if the same mistakes occur in the thesis, there may be a lot of good material in the thesis, so you can overlook the mistakes. But in these submissions, if all you have is mistakes, it creates a much more negative impression. Your Honor, all I can say is what her testimony was. I asked her the question, is this requirement that you're imposing on Mr. Novak, is that a requirement that you impose on all your students with regard to their finished product? And her answer was yes. Is there other evidence of the university, is there any evidence the university discriminating against people with post-traumatic stress disorder or similar ailments? We have no discovery. We were not able, and we asked that question, and we were not able to. I mean, why would they? What would be the purpose? I don't understand. Why would they? They might feel sorry for this person, but why would they be inclined to discriminate against them? I think in Mr. Novak's case, there's evidence to indicate that they were concerned about himself and his behavior. In the case of the defendant Schrock, she called up his therapist and asked him whether she had any reason to be concerned about him. His therapist assured her that there was no reason for concern. All of the defendants participated in a meeting where there was some faculty member at SIU that was concerned about Mr. Novak's behavior, and they participated in this meeting without Mr. Novak being there. And the decision was made that there was going to be a little, she would have a little peek hole that she could put in her door so that if somebody was coming to her door, that if it was Mr. Novak, then she could lock the door. There was no evidence at all that Mr. Novak had been bothering this person, had been harassing this person, engaging in any behavior that was inappropriate. Mr. Novak wasn't told in any way about this meeting. Was there any, is there anything in the record about the post-traumatic stress disorder, or what, involved? Yes, there is, Your Honor. Where would I find it? It wasn't in the briefs. It is in the statement of facts. He testified. Well, I know there's about a one line that he was in the Air Force and received an honorable release, but it didn't indicate what it was about. Yes, it is. Other than it had a sexual aspect. He was the victim of a sexual assault, Your Honor, and I don't think that was conceded. That point has been disputed. I see my light is on. If there's any further questions, I... Was he treated for this disorder? Yes, he was, Your Honor. And there is, there are documentation in the file where his treaters, one of his treaters, wrote to SIU and requested commendations for his disorder. Okay, well, thank you, Mr. Donovan. Mr. Cooper?  The fundamental problem with Mr. Novak's case is that all of his effort has been put into challenging what amounts to purely academic decisions. There is absolutely nothing in the record before this court, and obviously nothing in the record before the district court, supporting a claim that Mr. Novak's PTSD was in any way considered or played any role whatsoever in the decision to remove Mr. Novak from the doctoral program in curriculum and instruction. But we have been admonished repeatedly by the United States Supreme Court in Ewing, Horowitz, and this court has repeated and confirmed and applied the admonitions from the United States Supreme Court in the Anderson decision to restrain and not delve into the nuances of academic decision-making. And there are obviously very good reasons for that. Surely there are some limits to that, though, aren't there, sir? Absolutely, Your Honor. You can have a dishonest, palpably dishonest, academic decision. Of course. And lest there be any confusion, the university and the individual defendants and appellees have never taken the position that it's impossible to prove a claim of discrimination in the context of an academic decision. What we're saying is that there has to be some proof other than you disagree with the academic decision. And that is precisely how Mr. Novak has framed the issue before this court. If you look at page four and five of the brief, plaintiff says, the issue before the court is whether defendant's decision to fail Novak for day three was the result of reasoned academic judgment, in which case they should win, or whether there is a triable issue of fact that they did not use academic judgment and exercise bad faith, in which this case should remand for trial. What is reasoned academic judgment? Is this court going to decide whether Dr. Schrock or Dr. Smith or Dr. Mallett missed the boat somehow in terms of analyzing the particulars of his fourth, fourth day three submission? Obviously, with all due respect to the powerful intellect on this court and below, it is not for this court or a jury or the litigants for that matter to attempt to discern what is an appropriate day three response. But to answer your question, Your Honor, what are the limits of that? As in a case of employment discrimination, a student could prove discrimination in any number of ways. Your Honor, Judge Poggioner, you asked the question, is there evidence in the record, for instance, of mistreatment of persons with PTSD on some regular basis? Are other students, were they excluded from programs because of their PTSD? Not a shred of evidence. The difficulty in a case like this is that a person with this disability in a one-on-one situation like direction of a dissertation may be more difficult to work with, and there would be an incentive on the part of faculty to perhaps say, look, let's cut our losses. Let's not just deal with it. That's what we're concerned about. And the question is, to what degree can we look at the academic decision to exclude, to determine whether there's been that kind of discriminatory intent? There's got to be some kind of balance in our methodology there, and that's where we need some help. And I suppose I could hypothesize all kinds of things. If there were e-mails between faculty members saying, we can't work with this guy, he's got PTSD, he's impossible. Usually in a discrimination case, your evidence is a bit more circumstantial than that. I suppose, but I've seen stranger things. In this case, obviously under well-established standards for reviewing motions for summary judgment, there has to be a prima facie case. There has to be some evidence, direct or indirect, that would support a claim of discrimination, of intentional discrimination. But here, the district court found that not only was there not a convincing mosaic of circumstantial evidence, there was actually the opposite. But you do think the convincing mosaic formula still applies in the academic situation? I'm not sure that I've actually seen a discussion of the application of the convincing mosaic, where it's actually been used. I don't see where in the statute there's any academic exception.  Higher education today is an industry. It doesn't make cars, it makes degrees, but it's an industry. And it ought to be subject to law, just like people who make cars are. It ought to be subject to law, it is subject to law. But we do have, if you go back through Fed Third, you find a lot of poetry about deference to academic decision making, that doesn't comport with the reality of the academic industry. I hope I don't have to concede that it's an industry, in and of itself, and that's all it is. But I will agree... You can go through any edition of the Chronicle of Higher Education and see the word used. Absolutely, understood. I think I understand the point that you were making, Your Honor, that just because there is a rule of deference to academic decision making... That's how you began your argument, and right away, frankly, you caused me some concern, because I don't think there's an academic exception to the laws of the country. There is not, but we have to be guided by this notion that academic decision making is perhaps unique, and it provides a special context within which to decide these kinds of cases. That doesn't mean, Your Honor, not for one second, that academic decisions are completely removed from judicial review or careful contemplation to determine whether or not it fits within the usual matrix of analysis in these cases, either a direct evidence case or an indirect evidence case. So back to your question. Could there be a convincing mosaic presented that would support evidence of discrimination sufficient to overcome summary judgment in an academic decision making context? I see why not. I don't see why it could not be established through such a mosaic. It just wasn't in this case. No, we've gotten through that. Let's invite us to be minimalists and decide your case for you without deciding that cosmic problem. What is there in this record that shows that this was a bona fide decision and that they're devoid of any kind of pretext? Certainly, Your Honor. I think the record is full of evidence demonstrating that these three academics carefully considered Mr. Novak's day three submission. We have not only the contemporaneous notes typed record of their decision making analysis. We also have an email from Dr. Schrock which describes what her concerns were. And even more than that, with regard to two of these academics, Dr. Mallett and Dr. Schrock, we actually have the annotated versions of the day three submission which include all kinds of analysis of flaws and concerns with his submission. And in the case of Dr. Schrock, there is some question as to whether she called him for the omission of certain material that in fact he had included in day two, as I recall. I think that that particular point has less than the optimal amount of clarity. Let's just say it that way in this record. The district court, I think very appropriately, followed the rule that you look at the evidence in the light most favorable to the non-movement and said that even assuming that Dr. Schrock applied some analysis, some thoughts and some criticism to his day three submission that might have been more appropriately leveled to his prior submissions, the so-called chapter one of his day three submission. That would be an error of judgment rather than an indication of pretext. It did not indicate that the ultimate decision was a lie. Exactly. And of course we know from the many cases from this circuit and around the country that pretext isn't just being wrong. It's not making an error. I think the language is it's not merely an error, oddity or oversight. It has to be a lie. You have to have some evidence that these academics did not actually believe in the outcome that they reached. And the record... Is this tied up with sort of an anti-military aspect of this? In what sense? Well, that's... First of all, I don't... I still don't quite understand what the post-traumatic stress syndrome discharge was related to. And the subject of this matter had to do with military spouses. Sometimes in some academic faculties there seems to be an anti-military view of things. Did this have anything to do with this case? I can tell you that your question has raised that particular topic for the very first time in this case. Does SIU have a ROTC? I don't even know the answer to that, Your Honor. I'm not sure. I would assume large public institutions like SIU would have ROTC. Harvard does. I wasn't aware of that. I'm learning something new. But I don't think, Your Honor, to answer your question that this case has... Well, that was my point. It may not have been an issue. I'm just raising. Not at all. You can see our concern, Mr. Cooper, with your opening salvo, though. People of our generation do remember anti-military bias in the academic sphere. Understood. And we do realize that you could have a similar bias with respect to disability in this generation and are worried about how it's called out. I think it's fair for all of us to be concerned about such matters in a broader context, but luckily we don't have to confront those issues in the context of this case. Okay. Thank you, Mr. Cooper. Thank you, Your Honor. Mr. Donovan? I would like to talk about Dr. Schrock. Is there some history of discrimination against people with post-traumatic stress disorder? At SIU? Anywhere. You done any research on PSTD? I did not, Your Honor, for this case. Well, wouldn't that be very useful to know what the ailment is, what it does to people, how common it is, whether there's history of discrimination, whether, as my colleague suggested, there is some lingering hostility to the military, whether SIU has ROTC, right? I don't know if it does or it does not. Well, you haven't done any work on PSTD. Your Honor, what I did... PTSD. What I did do is... Well, it would be very good to have some information about what we're talking about. It would be nice to know what this disorder is, what are its intellectual effects, how common is it, is there prejudice against veterans who have this disorder? Wouldn't all that be relevant to try to figure out whether there's any discrimination here? Your Honor, what I thought my charge was number one, I did... Your charge is to find out everything you need to know about to be able to argue a case persuasively. If it's a case about a disease, you have to understand the disease. If it's a case about prejudice, you have to understand the prejudice. If I may respond, Your Honor, I do know that post-traumatic stress syndrome is recognized as a disability under the statute for cases... Okay, what kind of disability is it? What effect does it have? With regard to Mr. Novak, there's evidence in the record that he's treating physicians that he has difficulty discerning information, he needs extra time, he has difficulty particularly when he's operating under stress. And that is a documentation in the record, Your Honor. Well, that might explain why he didn't do well on these tests. It could. And they gave him, you know, a chance to take them over and over and over again. What more are they supposed to do? What Dr. Schrock had an obligation to do was to read his submissions, and she did not. She only read one of his submissions, decided that he had not met a criteria set out in the assignment, when in the earlier submission, both Dr. Millett and Dr. Smith had agreed that he had identified the needs for the study. When I asked Dr. Schrock on her deposition what was the principal reason why you failed Novak, she said because you didn't show a need for the study when he had already done that in the prior submission. And both Dr. Smith and Dr. Millett were at that meeting, and they made no statement to Dr. Schrock that Novak had already fulfilled that part of the assignment. I have to disagree with the finding of the district court that that was just a mistaken judgment on her part. She had an obligation to read his full submission before she failed. You say it was not a mistaken judgment? What was it? I think what it was, Your Honor, was it was either it was an intentional or reckless oversight, and I think under those circumstances Dr. Why would a reckless oversight be a form of discrimination? Your Honor, like I say, there's no evidence in the record that they dislike Novak expressly because of post-traumatic stress syndrome. But I do not believe, and I ask this question of Dr. Schrock and all the other people, the other two individual defendants, in the past have you ever failed somebody without reading their full submission? And the answer was no. In Novak's case we know with regard to Dr. Schrock she failed him for reasons that he had covered. Both Dr. Millett and Dr. Smith had agreed that he had made the needs assessment, performed the needs assessment analysis in a prior submission, and Dr. Schrock failed him for that reason, and both Smith and Millett didn't tell Schrock that she was making this error in judgment. And I ask that question of Dr. Millett. Well, why didn't you tell Dr. Schrock that she was doing this? And Dr. Millett said, I don't see any reason why I had to. Why would I do that? Well, I think that under these circumstances there's sufficient evidence that a jury should decide these questions. Thank you. Okay, well thank you very much to both counsel.